UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREAT DYNASTY INTERNATIONAL FINANCIAL HOLDINGS LIMITED,<br><br>    Plaintiff,<br><br>    v.<br><br>HAITING LI, *et al.*,<br><br>    Defendants.<br>_____/ | No. C-13-1734 EMC<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR RULE 11 INQUIRY AND GRANTING SANCTIONS UNDER THE COURT'S INHERENT AUTHORITY**<br><br>**(Docket No. 51)** |

        Plaintiff Great Dynasty International Financial Holdings, Ltd. ("GDI") brought this private action alleging violations of federal securities laws as well as state law claims, against Defendant Haiting Li, Defendant Zhiyan Li,[1] and derivatively on behalf of nominal Defendant Pacific Bepure Industry, Inc. ("PBEP") (collectively "Defendants"). In addition to being a shareholder in its own right, GDI was an assignee of the claims belonging to eight PBEP shareholders.[2] In a prior order the Court dismissed the action with leave to amend. *See* Docket No. 37. GDI then filed a first amended complaint ("FAC"), which GDI subsequently dismissed voluntarily. *See* Docket Nos. 39, 48. Currently before the Court is Defendants' motion for Federal Rule of Civil Procedure ("Rule") 11 inquiry under the Private Securities Litigation Reform Act ("PSLRA"), or in the alternative, for

---

[1] Defendant Zhiyan Li, Defendant Haiting Li's son and former employee of PBEP, was named only in the original complaint. Zhiyan Li was terminated as a defendant upon the filing of the first amended complaint ("FAC"). *See* FAC Docket No. 39.

[2] The named assignor shareholders included China Overseas Financial Group Limited, Asia Alpha Limited, Best Olympic Limited, Infinity Wealth Management Limited, Chinada International Limited, Liu Hansong, Hu Yicheng, and Liu Dongping (together "Assignor Shareholders"). *See* Complaint ¶ 5 Docket No. 1; FAC ¶ 4.

1  sanctions pursuant to the Court's inherent authority.  *See* Docket No. 51.  Having considered the
2  parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court
3  hereby **DENIES** the motion for Rule 11 inquiry under the PSLRA and **GRANTS** the motion for
4  sanctions under the Court's inherent authority.

## I.   FACTUAL & PROCEDURAL BACKGROUND

A.   Background Facts

The following allegations were contained in the FAC and PBEP's U.S. Securities and Exchange Commission ("SEC") Form 10-K for Fiscal Year End December 31, 2009  ("Form 10-K").  *See* Defendants' Request for Judicial Notice ("Def. RJN") Exhibit A, Form 10-K (Docket No. 43-1).

GDI was organized under the laws of the British Virgin Islands with its principal office in Beijing China.  *See* FAC ¶ 3.  GDI purchased shares in Wollemi Mining Corporation ("Wollemi") in October 2009.  *See* FAC ¶¶ 3, 15.  Wollemi was a publically traded company on the U.S. OTC Bulletin Board ("OTCBB") but no trading of its securities had occurred from its October 9, 2009 inception through November 5, 2009.  *See* FAC ¶ 12; Form 10-K at 24.  On November 5, 2009, Wollemi entered into a Share Exchange Agreement with Peakway Worldwide Ltd. ("Peakway") and its shareholder Cabo Development Ltd., pursuant to which Wollemi acquired 100% of the outstanding capital stock of Peakway in exchange for 10,500,000 shares of Wollemi's newly issued common stock.  *See* FAC ¶ 12; Form 10-K at 7, 24.  As a result of the share exchange, Defendant Haiting Li became the beneficial owner of approximately 70% of Wollemi's outstanding capital stock and became its Chief Executive Officer and Chairman (hereinafter the exchange between Wollemi and Peakway will be referred to as a "reverse merger").  *See* FAC ¶ 17; Form 10-K at 32-33.  According to GDI, GDI and the Assignor Shareholders controlled approximately 18.31% of the total outstanding shares of Wollemi but GDI did not make clear who owned the remaining 11.69%.  *See* FAC ¶ 18.  Yet, according to Defendants, GDI originally owned 100% of Wollemi and, following the reverse merger whereby 70% ownership was transferred back to Defendant Li, GDI retained a 30% interest in Wollemi.  *See* Def. Motion for Rule 11 Inquiry at 1-2.

Peakway was a holding company that owned two Chinese subsidiaries, Fujian Jinjing Pacific Shoes Co. and Fujian Baopiao Light Industry Company Ltd. *See* FAC ¶ 11. On December 17, 2009, Wollemi received approval from the Financial Industry Regulatory Authority to change its name from Wollemi Mining Corp. to Pacific Bepure Industry, Inc. and to begin trading under the symbol "PBEP." *See* FAC ¶ 12; Form 10-K at 22. Accordingly, the name of the stock that GDI and the Assignor Shareholders owned changed from Wollemi to PBEP. *See* FAC ¶ 12. PBEP was a Delaware corporation with principal offices in China, specializing in manufacturing and marketing of footwear. *See* FAC ¶¶ 5, 13. PBEP sold its products in at least twenty-two provinces in China as well as internationally through a distributor in South America and over the Internet. *See* FAC ¶ 14.

GDI alleges that at least one Assignor Shareholder, Mr. Liu Hansong, purchased additional PBEP shares through the U.S. OTCBB. However, GDI does not specify when those purchases occurred or if they occurred subsequent to the reverse merger. *See* FAC ¶ 15.

GDI alleges Defendants artificially inflated PBEP's net revenue and profit through public announcements and SEC filings. *See* FAC ¶¶ 19-40. In the alternative, GDI alleges Defendants artificially deflated PBEP's revenues and profit to the authorities in China. *See* FAC ¶¶ 26, 41. The first alleged misrepresentation occurred on January 27, 2010 where PBEP announced it anticipated that the full year sales for 2009 increased by at least 25% from 2008, prior to PBEP filing the 2009 fiscal year-end audited financials on March 31, 2010. *See* FAC ¶ 28. GDI alleges that various other misrepresentations were made throughout 2010 and 2011. It was not until November 11, 2011 that PBEP disclosed in its SEC Form 10-Q for fiscal quarter ending on September 30, 2011 that revenues had actually decreased approximately 30% and net profit decreased approximately 77% as compared with the same period in 2010. *See* FAC ¶ 46. On March 30, 2012, PBEP filed SEC Form 15 to voluntary deregister its common stock. *See* FAC ¶ 54.

B.  The Instant Case

On December 16, 2013, this Court granted Defendants' motion to dismiss the original complaint with leave to amend as to all claims, finding GDI failed to sufficiently allege falsity, scienter, causation, control person liability, demand futility, and a breach of the fiduciary duty. *See*

1  Order Granting Def. MTD (Docket No. 37).[3] On January 23, 2014, GDI filed the FAC asserting
2  three counts: (1) violation of Section 10(b) of Securities and Exchange Act and Rule 10b-5; (2)
3  violation of Section 20(a) of Securities and Exchange Act; and (3) breach of fiduciary duty. *See*
4  Docket No. 39. Defendants filed a motion to dismiss the FAC arguing, *inter alia*, it was neither a
5  purchaser nor seller of securities, GDI lacked standing to state a claim, and that GDI failed to
6  sufficiently plead all elements of the claims. *See* Motion to Dismiss the FAC (Docket No. 43).
7  Specifically, Defendants argued that because GDI acquired its stock in PBEP *prior to* the alleged
8  misrepresentations, GDI could not demonstrate that it purchased or sold securities that were
9  purported to have had an artificially inflated stock price. *See* Motion to Dismiss the FAC at 17-20.
10 As argued in the motion, this timing sequence – *i.e.,* the alleged misrepresentations occurred after
11 GDI acquired its stock – precluded GDI from asserting a federal securities fraud claim in light of
12 clear legal precedent which limits standing to purchasers and sellers of securities (*see e.g. Blue Chip*
13 *Stamps v. Manor Drug Stores*, 421 U.S. 723, 725-736 (1975)) and also prevented GDI from
14 demonstrating causation because no causal connection could have existed between the alleged
15 misrepresentations and the alleged harm.

16 After the Court heard the motion on April 10, 2014 and took the matter under submission,
17 GDI filed a notice of voluntary dismissal pursuant to Rule 41(a)(I)(A)(i) prior to the Court issuing
18 an order. *See* Docket No. 48. On April 17, 2014, the Court terminated the case and the pending
19 motion to dismiss, which it had anticipated granting with prejudice as to all claims, allowing leave to
20 amend only as to the one Assignee Shareholder, Mr. Liu Hansong, who may have purchased shares
21 *after* Defendants allegedly made misrepresentations. Defendants now move the Court to perform a
22 mandatory Rule 11 inquiry under the PSLRA or in the alternative, for sanctions under the Court's
23 inherent authority.

---

[3] GDI's original complaint asserted six claims: (1) violation of Section 10(b) of Securities and Exchange Act and Rule 10b-5; (2) violation of Section 20(a) of the Securities and Exchange Act; (3) breach of fiduciary duty against Defendant Haiting Li; (4) waste of corporate assets against Defendant Haiting Li; (5) unjust enrichment against Defendant Haiting Li; and (6) imposition of a constructive trust against Defendant Zhiyan Li. *See* Docket No. 1.

### C. New Facts Provided by Defendants With This Motion

As part of this motion, Defendants provide the Court with new information regarding the relationship between the parties. First, Defendants attach a complaint filed by PBEP against GDI in the Superior Court of Fulton County State of Georgia ("Georgia Complaint") alleging breach of contract claims. *See* Declaration of Schmidt ("Schmidt Decl.") in support of Motion Exhibit A, Georgia Complaint (Docket No. 51-2). Attached to the Georgia Complaint is an unsigned copy of the contract at issue in that action, entitled Cooperation Agreement for Listing Services ("Cooperation Agreement"). *See id.* Georgia Complaint Exhibit A, Cooperation Agreement. GDI does not contest the authenticity of the Cooperation Agreement. The Cooperation Agreement identifies Fujian Jinjiang Taipingyang Shoes, Co., Ltd. and Beijing Greater Dynasty Investment Co., Ltd. as the contracting parties but PBEP alleges in the Georgia Complaint that, through a variety of name changes and the reverse merger, the parties to the Cooperation Agreement became PBEP and GDI. *See id.* Georgia Complaint ¶ 23. The Cooperation Agreement states Fujian Jinjiang Taipingyang Shoes, Co., Ltd. will contribute 100% of its equity interest to the publically traded shell company owned by Beijing Greater Dynasty Investment Co., Ltd., and will subsequently obtain a 70% controlling stake in that publicly traded shell company, leaving Beijing Greater Dynasty Investment Co., Ltd. with a 30% interest – *i.e.,* the reverse merger. *See id.* Cooperation Agreement Art. 1 ¶ 2.

Under the Cooperation Agreement Defendants were required to make preparations for publically listing Fujian Jinjiang Taipingyang Shoes, Co., Ltd.'s company in the U.S., including preparing financial reports in accordance with U.S. generally accepted accounting principals ("GAAP") for three years prior, obtain a financial audit from an SEC recognized firm, and register a holding company in Hong Kong. *See id.* at Art. 1 ¶ 1. GDI was to ensure that the U.S. listed shell company was legally registered in full compliance with all U.S. legal formalities and without debt or legal dispute. *See id.* at Art. 2 ¶ 2. Furthermore, after listing on the OTCBB, GDI shall "complete the financial plan for [Wollemi] and formulate a detailed operable action plan" to raise funds in accordance with PBEP's financial plan. *See id.* at Art. 2 ¶ 4. The Cooperation Agreement contains a liquidated damages provision under which Fujian Jinjiang Taipingyang Shoes, Co., Ltd. would pay

Beijing Greater Dynasty Investment Co., Ltd. $800,000 plus up front costs if within two years commencing with the execution date, Fujian Jinjiang Taipingyang Shoes, Co., Ltd. abandoned implementation due to its own reasons. *See id.* at Art. 1 ¶ 3.

Second, Defendants provide six emails, from August 4th through 7th, 2011, between Mr. Xavier Waugh, GDI's founder, Chairman, and President, and Defendant Haiting Li. GDI does not contest the authenticity of the emails. The emails demonstrate Mr. Waugh solicited Defendant Li to sign a new contract entitled Amended Cooperation Agreement as well as "a private operation agreement," entitled Special Fund Agreement, that "should not be known to the lawyers or auditors" and would "enabl[e] you [Defendant Haiting Li] to handle accounts and sales flexibly and simplify operations." Declaration of Haiting Li ("Haiting Decl.") Ex. A at 7 Docket No. 51-1. In the emails, Mr. Waugh also stated that should a class action lawsuit be filed against PBEP, "I will be incapable to prevent the occurrence and snowballing of this event that is too terrible to think about, though I myself do not want them to happen." *Id.* at 4.

## II.   DISCUSSION

A.   PSLRA's Mandatory Rule 11 Inquiry

1.   Legal Standard

Rule 11(b) requires an attorney who is presenting to the court a pleading or motion, to certify to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The purposes of Rule 11 are to "to deter baseless filings in district court," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) and to deter "dilatory or abusive pretrial tactics and streamlin[e] of litigation." *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1536 (9th Cir. 1986) ("Rule 11 is intended to reduce the burden on district courts by sanctioning, and hence deterring, attorneys who submit motions or pleadings which cannot reasonably be supported in law or in fact.").

In any private action arising under the PSLRA, courts are required to make Rule 11 findings "upon final adjudication of the action." 15 U.S.C. § 78u–4(c)(1).[4] After termination of the action and upon motion by a party, the PSLRA requires the court to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). Section 78u–4(c)(2) requires the court to impose mandatory sanctions for any violation of Rule 11(b).[5] The presumptive sanction is for attorneys' fees and other expenses incurred in the action. *See* 15 U.S.C.A. § 78u-4(c)(3). The Second Circuit explains the purpose of the PSLRA's mandatory Rule 11 inquiry,

---

[4] Section 78u–4(c)(1) provides,

> In any private action arising under this chapter, *upon final adjudication* of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C. § 78u–4(c)(1) (emphasis added).

[5] Section 78u–4(c)(2) provides,

> If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

15 U.S.C. § 78u–4(c)(1).

> [r]ecognizing what it termed "the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims," and commenting that the "[e]xisting Rule 11 has not deterred abusive securities litigation," the 104th Congress included in the Private Securities Litigation Reform Act of 1995 ("PSLRA") a measure intended to put "teeth" in Rule 11. H.R. Conf. Rep. No. 104–369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 . . . The PSLRA thus does not in any way purport to alter the substantive standards for finding a violation of Rule 11, but functions merely to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found.

*Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 166-67 (2d Cir. 1999).

2. The PSLRA Requires a Final Adjudication

GDI argues that the PSLRA's mandatory inquiry does not apply here because GDI voluntarily dismissed the case without prejudice under Rule 41(a)(1)(A)(i), which is not a "final adjudication" under the PSLRA. In *Blaser v. Bessemer Trust Co.,* the district court for the Southern District of New York considered whether PSLRA's section 78u–4(c)(1) applied to a Rule 41(a)(1)(A)(i) voluntary dismissal, finding that

> [t]o the extent that plaintiff voluntarily dismissed her complaint without prejudice pursuant to Rule 41(a)(1)(i), this dispute has not been 'resolv[ed]' and the Court has not 'decid[ed]'the case. Nor has it 'hear[d] and settle[d]' the case. By the plain meaning of the term, there has been no 'adjudication' in this case, let alone adjudication that is 'final.'

01-CV-11599-DLC, 2002 WL 31359015 *3 (S.D.N.Y. Oct. 21, 2002). The court reasoned "[i]f Congress actually intended to saddle district courts with this task, it would have stated so explicitly instead of using the phrase 'final adjudication' as the trigger for the Rule 11 review." *Id.* Later, the court followed its same reasoning to conclude in another decision that "a court is not required to conduct the review of each party and attorney's compliance with Rule 11 as required by Section 78u-4(c)(1) after a plaintiff voluntary dismisses its case without prejudice." *Unite Here v. Cintas Corp.,* 500 F. Supp. 2d 332, 337 (S.D.N.Y. 2007); *see also In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 269 (S.D.N.Y. 2004) ("Because this case is dismissed without prejudice and with leave to re-file, the Court may not have made a 'final adjudication' and it may be unnecessary for the Court to rule on the applicability of Rule 11 sanctions at this time.").

Similarly, although not considering a voluntary dismissal directly, the district court for the Southern District of California concluded "that § 78u–4(c)(1)'s plain meaning clearly reveals that 'final adjudication' occurs upon a terminating decision, such as a verdict, summary judgment or dismissal *with prejudice* without leave to amend." *DeMarco v. Depotech Corp.,* 131 F. Supp. 2d 1185, 1187 (S.D. Cal. 2001) *aff'd* 32 F. App'x 260 (9th Cir. 2002) (emphasis added).

The Court agrees with these decisions that a voluntary dismissal without prejudice is not a final adjudication within the meaning of PSLRA. This conclusion comports with a plain reading of the statute: "In the absence of [a statutory] definition, [a court should] construe a statutory term in accordance with its ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994). Black's Law Dictionary defines "adjudication" as "[t]he legal process of resolving a dispute; the process of judicially deciding a case." Black's Law Dictionary (9th ed. 2009). Rule 41(a)(1)(A)(i) allows a plaintiff to voluntarily dismiss an action without a court order, by filing a notice of dismissal before the opposing party serves an answer. Because such a dismissal is without a court order, no judicial process is utilized in deciding the case, and the dispute is not resolved through adjudication. Accordingly, because there has been no final adjudication, the PSLRA does not require the Court to perform a Rule 11 inquiry pursuant to section § 78u-4(c)(1) and include on the record specific findings regarding compliance with Rule 11(b).

Defendants' reliance on *Smith v. Smith*, 184 F.R.D. 420, 422 (S.D. Fla. 1998), to the contrary is misplaced. There, the court granted defendants' motion for Rule 11 inquiry under the PSLRA even though the plaintiff had voluntarily dismissed the complaint upon notice of the Rule 11 motion. *Id.* at 421. *Smith* relied on the Supreme Court's 1990 decision in *Cooter & Gell* to hold "a voluntary dismissal does not bar the Court from imposing sanctions," while also finding the Rule 11(c) safe harbor provision, which allows a litigant to withdraw the offending pleading within twenty-one days of notice of the Rule 11 motion and escape sanctions, did not apply to federal securities actions brought under the PSLRA. *Smith*, 184 F.R.D. at 422 (relying on *Cooter & Gell*, 496 U.S. 384 (1990)). The Supreme Court made clear in *Cooter & Gell*, which was decided prior to the passage of the PSLRA, that "nothing in the language of Rule 41(a)(1)(i), Rule 11, or other statute or Federal Rule terminates a district court's authority to impose sanctions after such a

9

1 dismissal." 496 U.S. at 395. But, Congress' subsequent passage of the PSLRA plainly requires a mandatory Rule 11 inquiry only "upon final adjudication of the action." 15 U.S.C. § 78u-4(c)(1); *see Blaser,* 2002 WL 31359015 *4 ("Even if Section 78u–4(c) has the effect of eliminating any requirement that a Rule 11 motion be served or if one is served that the 21–day safe harbor has expired, Section 78u–4(c)(1) still requires that the Rule 11(b) review be conducted 'upon final adjudication of the action.' It is important in construing statutory language to give effect to each word Congress has chosen to use in drafting the statute. . ."); *see gen. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006) (discussion of the PSLRA's purpose). Accordingly, *Smith v. Smith* is inapposite.[6]

B. <u>Rule 11</u>

The Court need not consider whether Rule 11 provides a basis of sanctions irrespective of the PSLRA because Defendants only raise the issue in Reply. However, even if it was raised in the motion, Defendants fail to satisfy Rule 11's safe harbor provision. Rule 11(c) requires that motions "must not be filed or be presented to the court if the challenged paper . . . is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. 11(c)(2). The Ninth Circuit found the safe harbor's purpose was "abundantly clear," citing the Advisory Committee note that states,

> [t]hese provisions are intended to provide a type of 'safe harbor' against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refused to withdraw that position or to acknowledge candidly that it does not currently have evidence to support a specified allegation.

*Barber v. Miller*, 146 F.3d 707, 710 (9th Cir. 1998) (quoting Rule 11 Adv. Comm. Notes, 1993 Amend.). Because the purpose of the safe harbor is "to withdraw the offending pleading and *thereby escape sanctions,"* the Ninth Circuit held that a Rule 11 motion cannot be served after a complaint

---

[6] Defendants' reliance on *ITI Internet Services v. Solana Capital Partners* is inapposite because it does not address the question before the Court. There, the court held that a court's dismissal without prejudice for lack of prosecution, because defendants failed to file a joint status report, was a final adjudication under the PSLRA. *See* C055-2010Z, 2007 WL 666593 (W.D. Wash. Feb. 27, 2007). Here, GDI voluntarily dismissed its complaint *prior* to the Court issuing an order; unlike *ITI Internet Services*, there was no dismissal by the Court.

10

has been dismissed because it would not give the offending party the opportunity to escape the sanctions. *Id.* (emphasis in original) ("[W]e agree with the Sixth Circuit that 'a party cannot wait until after summary judgment to move for sanctions under Rule 11.'") (citing *Ridder v. City of Springfield*, 109 F.3d 288 (6th Cir.1997), *cert. denied*, 522 U.S. 1046 (1998)).

Here, the notice of motion and motion for sanctions were filed together on May 6, 2014, (*see* Docket No. 51), which was well after the offending pleading was withdrawn by GDI on April 17, 2014. *See* Docket No. 48. The twenty-one day notice was not satisfied because the notice of motion was not filed prior to the withdrawal of the offending pleading. Moreover, regardless of whether Defendants had provided the proper twenty-one day notice, the underlying purpose of the safe harbor precludes Defendants ability to move for sanctions given the offending pleading had already been withdrawn. *See e.g. Hockley by Hockley v. Shan Enterprises Ltd. P'ship*, 19 F. Supp. 2d 235, 241 (D.N.J. Aug. 5. 1998) ("Since [defendant] withdrew its position when it voluntarily dismissed its claims [against a third-party defendant], it is not subject to Rule 11 sanctions.").

Accordingly, the Court denies Defendants' motion for Rule 11 sanctions alone and pursuant to the PSLRA.

C.   Court's Inherent Authority

A court has the inherent authority to issue sanctions separate from the authority provided by the PSLRA or under Rule 11. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 41-42, 50 (1991); *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001) ("Three primary sources of authority enable courts to sanction parties or their lawyers for improper conduct (1) Federal Rule of Civil Procedure 11 . . . (2) 28 U.S.C. § 1927 . . . and (3) the court's inherent power."). To award sanctions, the court must make an explicit finding that there was conduct that constituted or was tantamount to bad faith. *See Fink*, 239 F.3d at 994 ("the cases discussed above make clear that sanctions are available if the court specifically finds bad faith or conduct tantamount to bad faith.").

In *Fink v. Gomez*, the Ninth Circuit held "[s]anctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." 239 F.3d at 994; *see also Primus*, 115 F.3d at 649 (citing *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996)) ("A finding of bad

faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.")  Frivolous filings are "those that are both baseless and made without a reasonable and competent inquiry." *Estate of Blue v. Cnty. of Los Angeles*, 120 F.3d 982, 985 (9th Cir. 1997).  "When a losing party has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons,' sanctions under the court's inherent powers may take the form of attorney's fees." *Primus*, 115 F.3d at 648 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59 (1975)).  Courts have "broad fact-finding powers to grant or decline sanctions" warranting "great deference." *Smith v. Lenches*, 263 F.3d 972, 978 (9th Cir. 2001) (citing *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir.1997)).

       Regarding the burden of proof, the Ninth Circuit has not concluded whether a court's bad faith finding must be supported by clear and convincing evidence. *See Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010) ("This court has not addressed the burden of proof required for a sanctions award. . . . The burden of proof issue need not be resolved here because the district court's bad faith finding is supported by clear and convincing evidence."); *In re Lehtinen*, 564 F.3d 1052, 1061 n. 4 (9th Cir.2009) (declining to address burden of proof because clear and convincing evidence of misconduct supported bad faith finding and imposition of sanctions under the court's inherent authority).  However, other circuits have held that clear and convincing evidence is required. *Shepherd v. Am. Broad. Companies, Inc*., 62 F.3d 1469, 1476-78 (D.C. Cir. 1995) ("for those inherent power sanctions that are fundamentally penal . . . [including] awards of attorneys' fees . . . the district court must find clear and convincing evidence of the predicate misconduct," also noting that the First, Third, Fifth, Eighth, and Eleventh Circuits have applied a clear and convincing burden of proof to a court's imposition of inherent authority sanctions); *see also Kelly v. U.S. Bank,* CIV. 08-1421-AC, 2010 WL 2817292 (D. Or. June 25, 2010) (same).

       1.    <u>GDI's Counsel's Conduct Was Tantamount to Bad Faith</u>

       The Court finds there is clear and convincing evidence that GDI's counsel, Ms. Sally W. Mimms and Mr. John F. Kloecker of Locke Lord, LLP (collectively "Counsel"), assertion of federal securities law claims, including violation of section 10(b) and Rule 10b-5 and section 20(a), on

behalf of GDI as well as most Assignor Shareholders, was both reckless and frivolous, and amounted to conduct tantamount to bad faith. As the Ninth Circuit held in *Fink*, 239 F.3d at 993, a showing of subjective bad faith is not required where there is "recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." Counsel's conduct was reckless and frivolous because a reasonable and competent inquiry into the law would have revealed that GDI and most Assignor Shareholders could not demonstrate (1) standing to assert federal securities fraud claims or (2) a causal connection between the purchase or sale the PBEP securities in reliance on the alleged misrepresentations, and an economic loss. *Cf. See Holgate v. Baldwin*, 425 F.3d 671, 677 (9th Cir. 2005) (Pursuant to Rule 11(b), "the reasonable inquiry test is meant to assist courts in discovering whether an attorney, after conducting an objectively reasonable inquiry into the facts and law, would have found the complaint to be well-founded.").

Federal securities fraud jurisprudence is clear that standing to bring a private action under section 10(b) and Rule 10b-5 is limited to "purchasers" or "sellers" of securities. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 725-736 (1975); *see Binder v. Gillespie*, 184 F.3d 1059, 1066-67 (9th Cir. 1999) ("As a matter of law, "conduct actionable under Rule 10b-5 must occur before investors purchase the securities."); *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1487 (9th Cir.1991) ("In addition to the requirement of an actual purchase or sale . . . we have also said that conduct actionable under Rule 10b–5 must occur before investors purchase the securities, if – as here – they allege the fraud induced them to make the purchase."); *Roberts v. Peat, Marwick, Mitchell & Co.,* 857 F.2d 646, 651 (9th Cir.1988) ("The actionable conduct must occur before the investors become purchasers of securities as required by *Blue Chip Stamps*." (citation omitted)).

Furthermore, to state a claim under section 10(b) and Rule 10b-5 a plaintiff must allege: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys., Inc. Sec. Litig.,* 411 F.3d 1006, 1014 (9th Cir.2005) (citing *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–42, (2005)). To allege a claim pursuant to section 20(a), the plaintiffs must allege: "(1) a primary violation of federal securities law, and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys.,* 228 F.3d 1057, 1065 (9th Cir.2000).

13

Here, GDI's acquisition of stock in Wollemi/PBEP *preceded* the alleged misrepresentations concerning PBEP's finances. Specifically, GDI and several Assignor Shareholders acquired their PBEP shares in connection to the reverse merger occurring on November 12, 2009. *See* Compl. ¶¶ 14, 17-19; FAC ¶¶ 3, 12, 15, 16. Yet, the first alleged misrepresentation did not occur until over two months later on January 27, 2010. Hence, the alleged misrepresentation could not have influenced their decision to acquire the stock, nor did it affect value of PBEP shares at the time of their acquisition.[7] *See* Compl. ¶ 20; FAC ¶ 28. Counsel had all necessary facts in their possession of which to evaluate whether the claims could be asserted; although GDI clearly lacked standing and could not demonstrate a causal connection, Counsel asserted the claims. Such conduct by Counsel was at the very least reckless and frivolous, because the claims had no basis in fact and Counsel failed to make a reasonable and competent inquiry into the law. *Cf. Holgate*, 425 F.3d 671, 677 (Court found claims were frivolous, warranting Rule 11 sanctions under Rule 11 where "[e]ven the most cursory legal inquiry would have revealed the required elements of the federal claims asserted, elements that the [plaintiff's] complaint did not allege."); *Estate of Blue*, 120 F.3d 982, 985 (9th Cir. 1997) (Frivolous filings are "those that are both baseless and made without a reasonable and competent inquiry.").

To be sure, GDI specifically identified one individual, Mr. Hansong, who may have purchased shares during the relevant time period, and yet, failed to identify when the additional shares were purchased or the amount. *See* FAC ¶ 15. To the extent Mr. Hansong purchased shares after the alleged misrepresentation, the Court finds that the securities fraud claims asserted as to those additional shares, were not frivolous.[8] However, the fact that Mr. Hansong may have

---

[7] Counsel argued in opposition to Defendants' motion to dismiss the FAC that the alleged misrepresentations generally occurred throughout 2009 and 2011, and that PBEP's financial reporting of revenue and net profit was inflated for the fiscal year 2009 "the time frame in which Plaintiff purchased its shares" citing FAC ¶¶ 19, 22. *See* Opposition to Motion to Dismiss FAC (Docket No. 44). However, misrepresentations contained in the 2009 financial reports were not disclosed until the SEC report was filed on *March 31, 2010. See* FAC ¶ 28; Def. RJN Ex. A.

[8] GDI's Counsel also argues in its opposition to this motion that it had a good faith basis for all of its claims because it "was prepared to add other shareholder Assignors who also purchased shares on the U.S. market." Opp. to Motion for Rule 11 Inquiry under the PSLRA at 9 (Docket No. 52). In an attempt to support its contention, Counsel attaches an exhibit to the opposition, which purports to be records of stock purchase in 2010 for 2011 for two individuals not named in either complaint, Hua Jiuin and Yue Shen. *See* Exhibit A, Docket No. 52-1. The exhibit is not in English

14

purchased shares after the alleged misrepresentation does not negate the fact that the majority of claims on behalf of GDI and the Assignor Shareholders were frivolous.

Accordingly, as to GDI and the Assignor Shareholders (other than Mr. Hansong's shares purchased on the OTCBB), Ms. Simms and Mr. Kloecker acted recklessly in filing frivolous federal securities fraud claims without a basis in fact or in law. Ms. Mimms and Mr. Kloecker, who was admitted *pro hac vice*, certified and / or signed the complaint[9] and the FAC, thus engaging in conduct tantamount to bad faith. That conduct is sanctionable under the inherent authority of this Court.

As for the remaining claims, including breach of fiduciary duty alleged in the complaint and the FAC (*see* Compl. Count III; FAC Count III) as well as waste of corporate assets alleged only in the complaint (*see* Compl. Count IV), the Court finds while the claims were meritless, they were not frivolous and do not support a finding of bad faith.[10] *Cf. Holgate*, 425 F.3d at 677 ("'the mere existence of one non-frivolous claim'" in a complaint does not immunize it from Rule 11 sanctions") (citing *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1364 (9th Cir.1990)).

2. GDI's Conduct (as a Party) Was Not Tantamount To Bad Faith

Having found Counsel liable for sanctions, the Court now turns to whether GDI itself is culpable because it too engaged in conduct tantamount to bad faith. Unlike Counsel, the Court does not expect GDI to be informed of the law in order to determine whether the claims were legally frivolous. Defendants argue that in addition to recklessness, GDI brought this lawsuit for the improper purpose of harassment. According to Defendants, PBEP originally contracted with GDI to assist PBEP in becoming listed on the U.S. stock exchange. *See* Schmidt Decl. Ex. A, Georgia

---

and is an unintelligible listing of numbers and headers. No foundation is laid for this document, and the Court declines to consider as evidence. The Court cannot conclude that the securities fraud claims were asserted in good faith as to these two individuals.

[9] Mr. Kloecker did not sign the original complaint because he was awaiting his status to appear *pro hac vice*. Because his name was provided both in the caption page and on the signatory line, the Court finds that Mr. Kloecker certified the pleading. *See* Docket No. 1.

[10] Regarding the remaining claims in the original complaint, including unjust enrichment (Count V) and imposition of a constructive trust (Count VI), as the Court concluded in its order granting the first motion to dismiss, these counts are remedies and not separate claims. *See* Docket No. 37.

15

1 Complaint.  After GDI failed to get PBEP listed on the U.S. exchange and PBEP observed and
2 reported a decline in profits, PBEP's Board of Directors decided it was in the company's best
3 interest to terminate its reporting obligations under the Securities Exchange Act.  *See* Def. Motion at
4 3.  In an attempt to salvage GDI's interest in PBEP, GDI purportedly tried to coerce Defendants to
5 sign a new contract so that GDI would remain as PBEP's financial consultant, handling its U.S. de-
6 registration and return to China.  *See id.* at 8-10.  Defendants' refusal to sign the new contract
7 allegedly prompted GDI to assert this lawsuit in retaliation and for the improper purpose of
8 harassment.

9       In support of this contention, Defendants provide the email exchange between Defendant
10 Haiting Li and GDI's founder, President, and Chairman, Mr. Xavier Waugh.  Defendants' argue the
11 emails demonstrate that Mr. Waugh threatened Defendant Haiting Li with this lawsuit if PBEP
12 refused to sign the new contract.  In the email, Mr. Waugh states that should a class action lawsuit
13 ensue, Mr. Waugh  "will be incapable to prevent the occurrence and snowballing of this event that is
14 too terrible to think about, though I myself [*e.g.* Mr. Waugh] do not want them to happen."  Haiting
15 Decl. Ex. A at 4.  While this statement could be viewed as a thinly-veiled threat of litigation against
16 Defendants, it is ambiguous.  The Court finds the emails are not sufficiently compelling to conclude
17 that GDI itself asserted the lawsuit with an improper purpose.

18       Next, Defendants argue the assertion of a $5 million damage claim with "no conceivable
19 theory" as to why GDI would be entitled to those damages, supports an inference of an improper
20 purpose.  According to Defendants, the assertion of a $5 million claim is particularly egregious
21 given:  (1) GDI paid nothing for its stock in PBEP, acquiring it instead through the reverse merger,
22 (2) GDI failed to perform its obligations under the Cooperation Agreement (*e.g.* getting PBEP listed
23 on the exchange), and (3) the liquidated damages provision in the Cooperation Agreement was for
24 much less in damages, *i.e.,* $800,000.  *See* Cooperation Agreement, Art. 1 ¶ 2.  Further, Defendants
25 argue that asserting this claim against Defendant Zhiyan Li, who was only a college student at that
26 time, was "based solely on the identity of his father [Defendant Haiting Li]" constituted harassment.

27       Defendants' reliance on *Hudson v. Moore Business Forms* to support its argument that the $5
28 million claim gives rise to an inference of improper purpose is unavailing.  There, the *Hudson* court

found a $4.2 million damages claim against an unemployed woman over 50 whose husband is living on retirement was "wholly unsubstantiated and unconscionable," raising a strong inference that the claim was brought for the improper purpose of harassment and subject to sanctions under Rule 11. 836 F.2d 1156, 1162 (9th Cir. 1987) (Counsel's "failure to justify the basis for the compensatory damage calculation and its inability to defend the lack of proportionality between the compensatory and punitive damages only serve to support the district court's conclusion that the damage claims were frivolous and brought to harass [the opposing party]."). Yet, the Ninth Circuit has since made clear that Rule 11's objective analysis allows for an *inference* of an improper purpose where a claim for damages is completely unsubstantiated. *See Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1365 (9th Cir. 1990) ("A district court confronted with solid evidence of a pleading's frivolousness may in circumstances that warrant it infer that it was filed for an improper purpose. That is precisely what the district court did in *Hudson*, 836 F.2d at 1162. This is permissible because the test for improper purpose is objective."). However, sanctions under the Court's inherent authority requires a specific showing of conduct tantamount to bad faith. While an unsubstantiated $5 million damage claim could be evidence of bad faith, it is not obvious that such a claim is totally out of proportion as in *Hudson*.

Lastly, Defendants argue that the contract between PBEP and GDI demonstrates that GDI's allegations were factually untenable, because GDI could not possibly have relied on any alleged misrepresentations given that "GDI was contractually responsible for overseeing and ensuring the accuracy of the very PBEP financials and other regulatory filings alleged to have been materially false." Motion at 11. In support, Defendants attach their complaint filed in Georgia Superior Court for breach of contract against GDI, which includes as an attachment an unsigned version of the Cooperation Agreement that is purportedly between PBEP and GDI.[11] *See* Schmidt Decl., Ex. A Cooperation Agreement. Defendants argue Article 2 ¶ 2 of the Cooperation Agreement demonstrates that GDI had full access to, and was responsible for the preparation of, PBEP financial reports. Article 2 ¶ 2 states that GDI "must ensure that the Listed Shell Company [*i.e.* Wollemi and

---

[11] In the Georgia Complaint, PBEP alleges that through a variety of name changes and the reverse merger, the parties to the Cooperation Agreement became PBEP and GDI. *See id.* Ex. A at 5, Georgia Complaint ¶ 23.

later PBEP] is accessible and that the Listed Shell Company available to Party A [*i.e.* PBEP] is a legally registered company in full compliance with United States legal formalities and requirements and with no debt or legal dispute." *Id.* at Art. 2 ¶ 2.  While this provision, as well as the Georgia Complaint generally, suggest that GDI was likely involved in maintaining PBEP's compliance with U.S. law that may have included the ability to access PBEP's financial information, the Court cannot conclude that GDI in fact obtained full access to PBEP's financial documents so as to belie any claim of reliance on an alleged misrepresentation.

The Court cannot conclude GDI's conduct was tantamount to bad faith.  The Court denies sanctions under its inherent authority against GDI.

D.     Type of Sanctions

"Because of their very potency, inherent powers must be exercised with restraint and discretion" and a "primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. 32, 44-45 (1991).  "[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 46 (citations omitted).  The Court's decision to impose attorneys' fees "transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself." *Id.*  Imposing attorney's fees as a sanction, "serv[es] the dual purpose of 'vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy.'" *Id.* (citing *Hutto v. Finney*, 437 U.S. 678, 689, n. 14 (1978); *see also Lahiri*, 606 F.3d at 1222 (affirming award of attorneys' fees and costs as the appropriate sanction under both 28 U.S.C. § 1927 and the court's inherent authority where the "bad faith finding was based on the cumulative effect of [plaintiff's counsel's] litigation conduct for more than five years."); *cf.* PSLRA, 15 U.S.C. § 78u-4(c)(3)(A)(ii) (where a "substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure [there is a presumption for] an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.").

After finding a basis of sanctions exists and prior to holding counsel liable for those sanctions, the court must first provide the offending party sufficient notice and an adequate hearing to contest the type and amount of sanctions proposed. *W. Sys., Inc. v. Ulloa*, 958 F.2d 864, 873 (9th Cir. 1992) (The court found the offending party was on notice for the basis of the sanctions but vacated the sanction amount, remanding "for a hearing on the appropriateness and the amount of the sanctions.").

Here, the Court finds Ms. Mimms, Mr. Kloecker, and Locke Lord LLP jointly and severally liable for Defendants' attorneys' fees and costs in connection with litigating the frivolous federal securities fraud claims in both the complaint and the FAC. Such an award would both vindicate the Court's judicial authority while also make Defendants whole for expenses incurred to defend the frivolous claims.

Defendants contend in this motion that they incurred $96,207.28 in fees and costs related to defending the action from commencement through the dismissal of the original complaint, and an additional to $66,378.53 in fees and costs related to defending the action from the Court's dismissal of the original complaint through hearing on Defendants' motion to dismiss the FAC, for a total of $162,585.81. *See* Schmidt Decl. ¶¶ 5, 6. Defendants have not yet accounted for the fees and costs incurred with bringing this motion for sanctions.

However, the parties have not had a chance to address the proper allocation of fees that should be attributable to frivolous (versus non-frivolous) claims. *See Lahiri*, 606 F.3d at 1222 (affirming district court's method in calculating sanctions finding that "[a]n apportioned percentage is not an abuse of discretion because it would be impossible to determine with mathematical precision the fees and costs generated only Kornarens [counsel who acted in bad faith]").

### III. CONCLUSION

For the foregoing reasons, the Court **DENIES** the motion for Rule 11 inquiry pursuant to the PSLRA and **GRANTS** the motion for sanctions pursuant to the Court's inherent authority. The Court hereby orders Defendants to submit a full accounting of their costs and expenses to date, and brief how the attorneys' fees should be allocated to its litigation of the frivolous claims. The Court also sets the following briefing schedule to allow GDI's Counsel the opportunity respond.

Defendants' supplemental brief and supporting material shall be filed by July 31, 2014. GDI's response shall be filed by August 14, 2014. The Court sets a hearing for 1:30 p.m., August 28, 2014.

This order disposes of Docket No. 51.

IT IS SO ORDERED.

Dated: July 10, 2014

_____
EDWARD M. CHEN
United States District Judge